FILED

2006 Aug-04  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RIGHT WAY RESTAURANTS, INC.,** an Alabama corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Case No.: 5:02-CV-1331-VEH** |
| **OLDFIELD EASTERN CORPORATION,** A Georgia Corporation, and **DONALD R. HARKLEROAD,** | ) ) ) ) | |
| Defendants. | ) ) | |
| **OLDFIELD EASTERN CORPORATION,** A Georgia Corporation; **DONALD R. HARKLEROAD; STEAK-OUT FRANCHISING, INC.;** and **STEAK-OUT, INC.,** | ) ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) | |
| **RIGHT WAY RESTAURANTS, INC.,** an Alabama corporation, and **DAVID MARTIN,** | ) ) ) ) | |
| Counterclaim Defendants. | ) ) | |

## <u>Memorandum Opinion</u>

Pending before the Court are the Cross Motions for Summary Judgment (doc.

59 and 61) filed by Plaintiff Right Way Restaurants, Inc. ("Right Way") and

Defendants Oldfield Eastern Corporation ("Oldfield") and Donald R. Harkleroad ("Harkleroad") respectively.[1]  Right Way contends that, pursuant to the Promissory Note executed by Harkleroad on behalf of Oldfield on March 17, 1995, it is entitled to summary judgment for breach of contract by Oldfield.  Oldfield and Harkleroad contend that the Promissory Note, which is the basis of Right Way's claims, is unenforceable as a matter of law.  They maintain that no genuine issues of material fact exist as to any of the claims asserted in Right Way's Complaint and, accordingly, that summary judgment in favor of Oldfield is appropriate on all claims in the Complaint.

The issues have been extensively briefed by all parties, and are now ripe for determination.  For the reasons articulated herein, the Court concludes that Right Way's motion for summary judgment is due to be **DENIED** and Oldfield's motion for summary judgment is due to be **DENIED**.

---

[1]   Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

# I.   FACTUAL BACKGROUND

David Martin ("Martin") originated the concept of home delivery of steaks, hamburgers, and chicken. (Martin, page 63). Under the adopted trademark of "Steak-Out", Martin developed a system by which food could be cooked to order, packaged, and delivered in a timely manner to consumers' homes, offices, or workplaces. (Martin, page 66). The first Steak-Out store opened on March 21, 1986 on Jordan Lane in Huntsville, Alabama. (Martin, page 14). Although the first Steak-Out store opened as a sole proprietorship, the business was shortly thereafter incorporated as Steak-Out, Inc. (hereinafter "Steak-Out/Alabama"), an Alabama corporation. (Martin, pages 14, 67).

In 1988, Steak-Out/Alabama and Martin decided to franchise the Steak-Out restaurants to independent owners. (Martin, page 65). To facilitate that decision, Steak-Out Franchising, Inc. ("SOFI") was created and incorporated as an Alabama corporation in 1988 as the owner of the franchising operations. After SOFI's formation, Steak-Out/Alabama entered into franchise agreements for the original Jordan Lane location, as well as a second store on Stephanie Drive in Huntsville, Alabama. (Defendant's Exhibits 2 and 3). SOFI and Steak-Out/Alabama again entered into a franchise agreement on July 23, 1990 for the operation of a restaurant

3

located at 2105 Whitesburg Drive in Huntsville, Alabama.  (Defendant's Exhibit 4).

On June 1, 1992, SOFI and Steak-Out/Alabama entered into yet another franchise

agreement to open a restaurant on Shelton Road in Huntsville, Alabama.

(Defendant's Exhibit 5).

At the time of these agreements, Steak-Out/Alabama owned the majority of

shares in SOFI.  (Ross, page 153).  However, for clarification purposes, Right Way

was the successor in interest to Steak-Out/Alabama by virtue of a name change

amendment filed with the Alabama Secretary of State.  Therefore, as of Spring, 1994,

Right Way owned the majority of SOFI's shares.

Gene Ross and Joe McCord were elected president and vice-president,

respectively, at a SOFI stockholders meeting in March of 1994.  (Ross, page 78;

McCord page 10; Plaintiff's Exhibit 2).  However, the parties heavily dispute whether

Martin turned over the day-to-day operation of SOFI to others.[2]

---

[2] Counter-Defendants aver that, in the Spring of 1994, Martin decided to devote his full energies
to his Huntsville, Alabama restaurants and to turn over the day-to-day operations of Steak-Out
Franchising to others.  (Ross, page 79).  However, Counter-Plaintiffs contend that Martin never
turned over the day-to-day operations, but was instead kept abreast of and involved in significant
business and operational issues regarding SOFI throughout 1994.   He was routinely copied on
significant documents (Letter to Gene Ross dated October 13, 1994; Letter to Gene Ross dated
October 28, 1994; Extending Area Development Agreement: Development Scheduled), and
Ross, as president, regularly consulted with Martin regarding significant business issues.  (Ross,
pages 155-57).
     Counter-Plaintiffs further assert that the termination of Gene Ross and Joe McCord in
December 1994 shows that Martin retained the authority to hire and fire even the most senior
executives of SOFI.  (Martin, pages 107-10).  In addition, Martin continued to have signature
authority on SOFI's bank accounts and was the only person authorized to borrow money in the

In early 1994, the decision was made to seek outside capital funding to enable SOFI to open "company stores" and expand their operations. (Ross, page 90; McCord, page 28). SOFI entered into an agreement with investment broker Phil Lundquist, as well as the Royce Corporation, in order to gain private venture capital.[3] (McCord, page 13). SOFI consequently retained the law firm of Harkleroad and Hermance in Atlanta, Georgia to prepare a Private Placement Memorandum (hereinafter "PPM"). (McCord, page 57). Harkleroad, the senior partner of the firm at that time, holds himself out to the public as a specialist in corporate acquisitions. (*See* Hackleroad, page 14).

During Spring and Summer of 1994, information was prepared and submitted for use in the PPM. The parties heavily dispute the extent of Martin's involvement in this effort, as well as the process by which the information was requested by Mr. Hermance and provided by SOFI.[4] (Ross, pages 155-56). However, it is undisputed

---

company's name. (Fratesi, pages 83-88). During this time, Martin participated in meetings on behalf of SOFI and controlled the private placement process. (Agreement in Principle; Letter to Gene Ross dated March 8, 1994; Letter to Ross, McCord, and Manning from Martin dated March 15, 1994). Finally, they contend that Right Way owned a controlling interest in SOFI in late 1994, and Martin remained the sole director and chairman of the board of SOFI throughout that time. (Martin, pages 110, 185-86).

[3] Counterclaim Plaintiffs contend that the purpose of this outside funding was primarily to buy back Right Way's stock for the benefit of Right Way and Martin. (Private Placement Memorandum, page 9).

[4] Right Way and Martin contend that the information provided in the PPM was that which Mr. Hermance requested. (Ross, page 255). However, Oldfield and Harkleroad contend that the staff

that SOFI brought Joe McCord into the company for the purpose of raising the additional capital funds.  (Ross, page 80).  It is further undisputed that McCord was the primary liaison between SOFI and Phil Lundquist and was the primary contact with Mr. Hermance.  (McCord, pages 14, 42, 48, 57).

In December 1994, the decision was made to refrain from pursuing the private placement offering.  (McCord, page 67;Martin, page 109).  Martin, as chairman of the board of SOFI, made the decision to terminate both McCord and Ross and to downsize SOFI.  (Martin, pages 107-08; McCord, page 69).  After Ross' termination, B.J. Fratesi, the former chief financial officer, was elevated to the position of president.  (Fratesi, page 34).

The firm of Harkleroad and Hermance billed SOFI approximately $100,000.00 for its services in preparing the PPM.  (Martin, page 346).  Martin contends that Harkleroad expressed an interest in buying the controlling interest in SOFI from Right Way during discussions related to the firm's charges.  (*Id.*, pages 345-46).  However, Harkleroad contends that Martin simply appeared on his doorstep attempting to sell him the controlling interest in the corporation.  (Harkleroad, pages

---

of SOFI, likely including Martin, held a meeting with John Manning wherein they divided responsibility for getting information to Mr. Hermance.  (Hasty, pages 88-100).  This process included the "marking up" and substantive revision of drafts sent by Mr. Hermance to SOFI employees.  (Hasty, pages 97-100).

31, 37-38).  Harkleroad denies any prior acquaintance with Martin or any knowledge of SOFI or its operations.  (Harkleroad, page 31).

On January 10, 1995, SOFI's shareholders approved the resignation of Martin as director.  (Defendant's Exhibit 27).  They also approved the appointment of Harkleroad as SOFI's new director and the proposed issuance to Harkleroad of 15% of the issued and outstanding shares of the corporation as part of his compensation package for his new position.  *Id.*

On January 11, 1995, SOFI, Right Way , Martin, and Oldfield entered into an agreement stipulating that Right Way would sell 900 shares of SOFI stock to Oldfield for the total sum of $900,000.00.  (Defendant's Exhibit 25).  Pursuant to the January 11, 1995 Agreement, William D. Hasty was appointed as Escrow Agent to retain physical custody of: (1) the SOFI stock; (2) Martin's and Harkleroad's undated resignations as directors of SOFI; and (3) a letter from Harkleroad and Hermance relating to the legal fees.  (Defendant's Exhibit 28).

On March 17, 1995, a series of documents was executed in Huntsville, Alabama.  The documents included a promissory note in the amount of $550,000.00 from Oldfield to Right Way, payable in 18 months with a 9% per annum interest rate. (Defendant's Exhibit 29).   On the same date, Harkleroad executed a guaranty agreement and an amended and restated addendum; furthermore, subsequent to the

execution of the documents, the escrow agent transferred the stock pursuant to the escrow agreement. (Defendant's Exhibit 35). It is in dispute whether the promissory note and the guaranty, two of the documents executed on that date, were part of the contract which included the January 11, 2995 Agreement.

Harkleroad states that he relied on the PPM and alleged misrepresentations made to him by Martin in deciding to purchase stock from SOFI. Further, he claims that Martin and Right Way suppressed certain material matters in connection with the sale of the stock. Although the date is in dispute, at some point Gene Ross met with Harkleroad in his office "to talk with him about the state of Steak-Out. And to decide whether or not to buy it or not. Because David had offered to sell, for sale." (Ross, page 137). In that meeting, Harkleroad asked him "what I should know about this company before I buy it." (Ross, pages 138, 139). Whether or not Ross and McCord discussed with Harkleroad the strengths and weaknesses of the Steak-Out system, the franchisees, and individual employees is still a matter in dispute.

McCord testified to reviewing documents for Harkleroad prior to March 17, 199, providing him with information, including financial analysis and general comments regarding SOFI; he also testifies to having advised Harkleroad that a

franchisee association had been formed prior to that time.[5]  (Plaintiff's Exhibits 26, 27, 28; McCord, pages 80-91).  As director of operations, McCord was knowledgeable about the financial condition of franchisees and of SOFI as of the time he left the corporation in late December of 1994.  (McCord, pages 93, 94, 95).  McCord was also aware of the franchisees who were not in compliance with the franchise agreements, as well as those that were failing.[6]  (McCord, page 94).

Prior to March 17, 1995, Harkleroad also had discussions with Judy Patuci, SOFI's Marketing Director.[7]  (Ross, pages 145, 146).  In addition, Ross and McCord developed a one hundred day business plan for SOFI during the period prior to March 17, 1995.  (Ross, page 145; Evidentiary Submission at tab "A").  However, that plan was not followed by Harkleroad.[8]

---

[5] Oldfield and Harkleroad contend that these allegations are irrelevant because McCord testified that he did not meet with Harkleroad regarding purchase of SOFI prior to January 11, 1995, and, thereafter, Defendants were already bound by the January 11, 1995 Agreement.  (McCord, pages 69-71).  In addition, they contend the allegations are irrelevant because Harkleroad was not informed of the franchise association prior to the January 11, 1995 Agreement.  (*Id.*).

[6] Oldfield and Harkleroad contend that this is irrelevant because Ross did not communicate his knowledge to Harkleroad prior to the January 11, 1995 Agreement.  (January 11, 1995 Agreement; Declaration of  Harkleroad).

[7] Oldfield and Harkleroad contend that this is irrelevant because Defendants were already bound by the January 11, 1995 Agreement at the time of these discussions.  (January 11, 1995 Agreement).

[8] Oldfield and Harkleroad contend that this is irrelevant and immaterial because these discussions and documents came after the January 11, 1995 Agreement.  (January 11, 1995 Agreement).

## History of the Franchise Agreements

Currently, Right Way owns and operates five Steak-Out restaurants in Madison County, Alabama. (Martin, pages 27-28). The store number for restaurants are 1001, 1002, 1003, 1010, and 1019. *Id.* In the past, stores 1001, 1002, 1003, and 1010 operated under franchise agreements entered into with SOFI. (Martin, pages 27-28; Counterclaim Plaintiff's First Submitted Counterclaim, ¶ 45-49). Although the UFAs have expired for the stores which operated under franchise agreements, Right Way continues to operate those restaurants under the Steak-Out Marks in substantially the same manner as they operated prior to the expiration of the UFAs; stores are operated in the same location, using the same trademarks, logos, menu items, and uniforms. (Martin, pages 96-97, 452-54, 491-93).

Right Way continues to purchase from suppliers designated by SOFI for the Steak-Out System. (Martin, pages 92-93). Right Way continues to pay the same 2% promotion and development fees required under the UFAs and provide the same required financial and sales reporting statements, just as was done prior to the expiration of the UFAs. (Martin, pages 87-89). Right Way also continues to allow SOFI to show the stores to prospective Steak-Out franchisees in the same manner as was done prior to the expiration of the UFAs. (Martin, pages 89-90).

The franchise agreements for stores 1001 (Jordan Lane) and 1002 (Stephanie

Drive) were entered into on October 17, 1988 and expired, according to each agreement's terms, on October 17, 1998.  (Defendant's Exhibit 2 at RW00205 and RW00248).  The franchise agreement for store 1003 (Whitesburg Drive) was entered into on July 23, 1990 and expired, according to its terms, on July 23, 2000. (Defendant's Exhibit 4 at RW00285).   Finally, the franchise agreement for store 1010 (Shelton Road) was entered into on June 1, 1992 and expired, according to its terms, on June 1, 2002.  (Defendant's Exhibit 5 at RW00320).

The parties dispute whether store 1019 ever operated under a franchise agreement with SOFI, and whether Right Way is currently a franchisee of SOFI.[9]  It is also disputed whether Harkleroad represented that he would prepare language for Exhibit A–regarding founder's rights–and bring it to the closing on March 17, 1995.

### The History of the Steak-Out Trademark

Pursuant to an assignment, Steak-Out/Alabama acquired rights in 1987 to the Federal Trademark Registration for the marks "Steak-Out" and "The Steak-Out" (registration numbers 854, 875, 999, and 144 respectively, subject to a reservation of

---

[9] Right Way and Martin contend that Right Way is not presently a franchisee of SOFI.  However, Oldfield and Harkleroad aver that, although the temporal terms of the written UFAs for Plaintiffs' stores have expired, Plaintiffs have continued to operate those restaurants (and an unauthorized restaurant opened in 1995) under the Steak-Out Marks and in the same manner as they did before expiration.  (Martin, pages 96-97).  Therefore, they claim that Plaintiffs' continuing operations on the same terms after the lapse of their UFAs has the legal effect of renewing their previous UFAs on those same terms.

use by the original registrant)(Martin, pages 68-69). The marks were purchased from The Steak Club, Inc. and assigned to Steak-Out, Inc., with the exception of the state of New York and the New England states. (Martin, pages 69-70).

Steak-Out/Alabama licensed use of the Steak-Out marks to SOFI after its formation in 1987. (Martin, pages 121-22). An October 1, 1991 addendum to the License Agreement expressly states, "Licensor [Steak-Out/Alabama and now Right Way] and Licensee [SOFI] agree that Licensor shall retain the exclusive rights to utilize the 'Steak-out' mark in Madison County, Alabama." (Defendant's Exhibit 7). A September 15, 1992 addendum to the License Agreement contains the identical language.[10]

On March 1, 1994, Steak-Out/Alabama (now Right Way) assigned the Steak-Out trademarks to SOFI. (Martin, page 124; Defendant's Exhibit 9). This document, assigning ownership of the mark, except for Madison County, Alabama, was part of the private placement offering. (Martin, page 126; Ross, pages 90, 91, 92, and 107). Martin consistently maintained that he wanted to retain ownership of the mark in Madison County. (Martin, page 99). Ross testified that Martin's main concern was keeping the Steak-Out trademark rights in Madison County. (Ross, pages 93-94).

---

[10] Oldfield and Harkleroad contend that this allegation is irrelevant because both of these agreements referenced herein have been superceded by the Assignment Agreement between Right Way and SOFI. (Assignment of Registered Marks and Agreement).

Specifically, Ross testified that "David [Martin] wanted to make sure that nobody else built Steak-Out stores in Madison County, and that he continued to have the rights to the mark." (Ross, page 93).  To achieve this, an Assignment Agreement was drafted which  included the following provision:

> "As additional consideration, Assignee [SOFI] hereby agrees that Assignor [Steak-Out/Alabama, now Right Way ], shall retain the exclusive right to utilize the "Steak-out" marks in Madison County, Alabama: and that from and after the date of this Agreement, Assignor shall not be required to pay royalties pursuant to the UFA between Assignor and Assignee for franchises in Madison County, Alabama."

(Defendants' Exhibit 8.)  Addenda to the original agreement, dated November 16, 1994, and March 17, 1995, contain provisions to the same effect.  (Defendants Exhibits 10, 35).  On March 16, 1995, Martin executed an "Agreement-Not-To-Compete," which Harkleroad also executed as Steak-Out's chief executive officer.[11]  That agreement provided that it "would be governed by and construed in accordance with the laws of the State of Alabama."[12] On March 17, 1995, Harkleroad executed a promissory note on behalf of Oldfield in the principal amount of $550,000.[13]  The promissory note also provided that it would be construed in accordance with Alabama

---

[11]Doc. no. 23 (Submission of Evidence in Opposition to Defendants' Motion to Dismiss or Transfer), ex. B.

[12]*Id.* at 9.

[13]*Id.*, ex. C.

law.[14]  Additionally, Harkleroad executed a guaranty on March 17, 1995, pursuant to which he personally guaranteed and promised to pay, in the event of Oldfield's default, the first $250,000 due under the promissory note.[15]  The promissory note and guaranty were executed by Harkleroad and Martin in Huntsville, Alabama.[16]  On the same day, Harkleroad attended a meeting of Steak-Out franchisees at the Huntsville Hilton, and announced the sale.[17]

The March 17, 1995 addendum was executed by Harkleroad in his capacity as Chief Executive Officer of SOFI.  (Defendants' Exhibit 35).  Whether the rights reserved to Right Way in the Assignment Agreement granted an exclusive territorial license or whether they amounted to a reservation of the exclusive rights without any connection to a franchise is a matter that remainsin great dispute.

## The Present  Action

Right Way and Martin allege that neither Oldfield nor Harkleroad paid the $550,000 balance due under the terms of the sales agreement.  Harkleroad admits executing that note, and further admits that the $550,000.00 owed under the

---

[14]*Id.*

[15]*Id.*, ex. D.

[16]Doc. no. 24 (Affidavit of David Gene Martin), at 2.

[17]*Id.*

14

promissory note has not been paid. (Harkleroad, pages 111-12, 163)  However, Oldfield and Harkleroad contend that the promissory note and guaranty are unenforceable and therefore they are not liable for the $550,000.00. On May 30, 2002, Right Way filed a civil action seeking payment and interest pursuant to the promissory note. Right Way then filed a motion for summary judgment seeking relief for breach of contract pertaining to Defendants' failure to pay on the promissory note. Defendants responded by filing a cross motion for summary judgment seeking relief for breach of contract based on the allegation that the promissory note and guaranty are unenforceable as a matter of law because Plaintiffs failed to provide sufficient consideration for them.

## **Summary Judgment Standard**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the

burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving

17

party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden

by using this second method, the non-moving party may either point to evidence in

the court record, overlooked or ignored by the movant, sufficient to withstand a

directed verdict, or the non-moving party may come forward with additional evidence

sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency.  However, when responding, the non-movant can no longer

rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*,

518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992)).

<u>**Analysis**</u>

**I.      Count One-Breach of Contract**

Right Way asserts that it is entitled to summary judgment with regard to its

claim for breach of contract under the promissory note.  Oldfield contends that Right

Way is not entitled to summary judgment because the promissory note  at issue was

not supported by valid consideration.  Further, Oldfield contends that, because there

are counterclaims pending, particularly the claim of fraud in the inducement, deciding

Right Way's claim under the promissory note without deciding the counterclaim of

fraudulent inducement poses an unreasonable risk of inconsistent results.  The Court

agrees with Oldfield's assertion.  For example, if the Court were to determine at a

18

preliminary stage that the Note was in fact enforceable, and later determine as a matter of law that there was fraud in the inducement, the outcomes could certainly be inconsistent. Clearly, the two issues are so closely intertwined that separate adjudication would pose an unreasonable risk of inconsistent results.  To avoid such a risk, the Court will refrain from considering the validity of the Note as a preliminary matter.  Therefore, Right Way's motion for summary judgment (doc. 59) for breach of contact based on the failure of Oldfield to satisfy its obligation under the Note is due to be **DENIED**.

## A.    Consideration

Although the Court has previously determined that it will not determine the enforceability of the Note in relation to fraud, it will address the issue raised by Oldfield pertaining to  whether there was sufficient consideration for the Note.

Right Way asserts that Oldfield breached its contract with Right Way by failing to satisfy the terms of the Promissory Note executed by Harkleroad on behalf of Oldfield on March 17, 2005.[18]  Oldfield argues, however, that the Promissory Note,

---

[18]Under Alabama law, to establish a breach of contract, a plaintiff must prove: (i) the existence of a contract; (ii) performance by the plaintiff; (iii) the failure of defendant to perform some action required by the contract or the performance of defendant of some action prohibited by the contract; and (iv) damages proximately caused by such breach.  *Moundville Lumber Co. v. Warren*, 203 Ala. 488, 83 So. 479 (Ala. 1919).  In the present case, Right Way contends that there is a valid binding promissory note between Right Way and Oldfield Eastern; Right Way has performed under that note; Oldfield Eastern has failed to pay under the note; and Right Way has been damaged by Oldfield Eastern's failure to pay on the note.

which is the basis of Right Way 's Complaint, is not supported by valid consideration and therefore fails as a matter of law.

Oldfield argues that the Promissory Note served to modify the parties' prior agreement, and was therefore dependent upon preexisting consideration. Oldfield concludes therefore that because there was no new consideration for the Promissory Note, it is unenforceable as a matter of law. The record, however, illustrates otherwise. Under Alabama law, the requirement of consideration applies to both original and modified contracts. "'[W]hen a contract is altered in some or all of its essential features, or is supplanted by a substitute, the secondary contract must have a new consideration, which may be, of course, the release of old obligations, the lightening of former burdens, the according of new benefits or advantages, but if all the benefits are conferred upon one party, and all the burdens put upon the other, a consideration will be lacking, and the new contract will be void...' " *Huntsville and Madison County R.R. Authority v. Alabama Indus. R.R., Inc.,* 505 So.2d 341, 343 - 344 (Ala.,1987)(citing *Winegardner v. Burns,* 361 So.2d 1054, 1057 (Ala.1978) quoting *Moore v. Williamson,* 213 Ala. 274, 104 So. 645 (1925)). A review of the Agreement itself shows that if the initial payment was not made, the agreement was deemed abandoned. Similarly, the escrow agreement provided alternative instructions to the escrow agent in the event the transaction did not close. The letter

on legal fees from Harkleroad & Hermance, included as part of the escrow, provided for differing legal fees based on whether the transaction was closed. Although the defendants take the position that the January 11, 1995 Agreement was the "sales" agreement, there are numerous documents that were contemplated by the Agreement, but not executed until later.[19]  The defendants transferred the $350,000.00 payment by wire transfer to the trust account of the escrow agent on March 15, 1995. (Hasty Affidavit, p. 2).  Later that same day, Harkleroad sent by facsimile the first draft of the promissory note and guaranty.  Harkleroad was already preparing the promissory note and guaranty when the payment was wired to the escrow agent.  The escrow agent had a duty to disburse the funds in accordance with the escrow, thus, as the transaction had not yet closed, no disbursement had yet been made to Right Way. Once the final sale documents, including the promissory note and guaranty, were executed on March 17, 1995, then, and only then, was the $350,000.00 transferred to Right Way.  As is set out in the Hasty Affidavit, Hasty and Harkleroad discussed the terms of the promissory note and guaranty for two days prior to this disbursement.

_____

[19]Oldfield and Harkleroad subsequently executed the instruments (Promissory Note and Guaranty) on March 17, 1995.  Similarly, Martin was to act as a consultant to SOFI, agreed not to compete, and agreed to provide training facilities.  On March 16, 1995, Martin executed an Amendment to Consulting Agreement, an Agreement Not To Compete and a Training Agreement.  Martin also executed, on behalf of Right Way Restaurants, an Option to Purchase Shares of Steak-Out Franchising, Inc.

Further, Harkleroad, in Exhibit 4 to the Hasty Affidavit, specifically states that the payment by Oldfield was made by the escrow agent to Right Way on March 17, 1995. Harkleroad then goes on to affirm that the escrow agent properly disbursed those funds and that the escrow had been fulfilled.  Thus, for Harkleroad to allege that it was only after he had made the first payment that any mention of the promissory note and guaranty arose, is contrary to the undisputed evidence.

Based on the record, the Court finds that the Promissory Note is in fact part of the January Agreement executed by Plaintiffs and Defendants.    Therefore, Defendants' Motion for summary judgment (doc. 61) is due to be **DENIED**.

## Conclusion

Based upon the foregoing, the cross motions for summary judgment are due to be **DENIED**.

**A** separate **ORDER** will be entered.

**DONE** this 4th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge