FILED

2006 Aug-04  PM 12:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **RIGHT WAY RESTAURANTS, INC.,**<br>**An Alabama Corporation,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case: 5:02-CV-1331-VEH** |
| | ) |
| **OLDFIELD EASTERN CORPORATION,**<br>**A Georgia Corporation, and DONALD**<br>**R. HARKLEROAD,** | ) |
| | ) |
| | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **OLDFIELD EASTERN CORPORATION,**<br>**A Georgia Corporation, DONALD**<br>**R. HARKLEROAD, STEAK-OUT**<br>**FRANCHISING, INC., and STEAK-OUT,**<br>**INC.,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Counterclaim Plaintiffs,** | ) |
| | ) |
| **Right Way RESTAURANTS, INC.,**<br>**An Alabama Corporation, and DAVID**<br>**MARTIN,** | ) |
| | ) |
| | ) |
| | ) |
| **Counterclaim Defendants.** | ) |

## <u>MEMORANDUM OPINION</u>

Pending before the Court are the Cross Motions for Summary Judgment filed

by Counterclaim Defendants Right Way Restaurants, Inc. (hereinafter "Right Way")

and David Martin (hereinafter "Martin") (doc. 58 ) and Counterclaim Plaintiffs

Oldfield Eastern Corporation (hereinafter "Oldfield") and Donald R. Harkleroad (hereinafter "Harkleroad"), Steak-out Franchising, Inc., and Steak-out, Inc. (docs. 62 & 63).[1]

In their First Amended Counterclaim, Counterclaim Plaintiffs allege the following claims against Right Way and Martin: Common Law Fraud (Count I); Securities Fraud (Count II); Federal Trademark Infringement (Count III); Federal Unfair Competition (Count IV); Federal Trademark Dilution (Count V); Common Law Trademark Infringement (Count VI); Breach of Contract (Post-termination Obligations) (Count VII); Unjust Enrichment (Count VIII); Breach of Contract (Count IX); and Specific Enforcement of Novation (Count X).

_____Right Way and Martin contend that they are entitled to summary judgment in their favor as to all claims asserted against them in Oldfield and Harkleroad's First Amended Counterclaim.[2]  Similarly, Oldfield and Harkleroad contend that they are

---

[1]Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

[2]Motion for Summary Judgment By Counterclaim Defendants.

entitled to summary judgment in their favor as to liability[3] for Counts One, Two, Three, Four, Six, and Seven alleged in their First Amended Counterclaim.[4]

The matters have been briefed extensively by all parties, and are now ripe for determination.

## **FACTUAL BACKGROUND**

David Martin originated the concept of home delivery of steaks, hamburgers, and chicken. (Martin, page 63). Under the adopted trademark of "Steak-Out", Martin developed a system by which food could be cooked to order, packaged, and deliver in a timely manner to consumers' homes, offices, or workplaces. (Martin, page 66). The first Steak-Out store opened on March 21, 1986 on Jordan Lane in Huntsville, Alabama. (Martin, page 14). Although the first Steak-Out store opened as a sole proprietorship, the business was shortly thereafter incorporated as Steak-Out, Inc. (hereinafter "Steak-Out/Alabama"), an Alabama corporation. (Martin, pages 14, 67).

In 1988, Steak-Out/Alabama and Martin decided to franchise the Steak-Out restaurants to independent owners. (Martin, page 65). To facilitate that decision,

---

[3]Counterclaim Plaintiffs seek summary judgment in their favor only as to elements of liability, and reserve the issues of the nature and amount of any damages for trial.

[4]Counterclaim Plaintiffs's Motion for Partial Summary Judgment of Liability on Counts One and Two of Their First Amended Counterclaim; Counterclaim Plaintiffs' Motion for Partial Summary Judgment of Liability on Counts One, Two, Three, Four, Six, and Seven of Their First Amended Counterclaim.

Steak-Out Franchising, Inc. ("SOFI") was created and incorporated as an Alabama corporation in 1988 as the owner of the franchising operations. After SOFI's formation, Steak-Out/Alabama entered into franchise agreements for the original Jordan Lane location, as well as a second store on Stephanie Drive in Huntsville, Alabama. (Defendant's Exhibit 2 and 3). SOFI and Steak-Out/Alabama again entered into a franchise agreement on July 23, 1990 for the operation of a restaurant located at 2105 Whitesburg Drive in Huntsville, Alabama. (Defendant's Exhibit 4). On June 1, 1992, SOFI and Steak-Out/Alabama entered into yet another franchise agreement to open a restaurant on Shelton Road in Huntsville, Alabama. (Defendant's Exhibit 5).

At the time of these agreements, Steak-Out/Alabama owned the majority of shares in SOFI. (Ross, page 153). However, for clarification purposes, Right Way was the successor in interest to Steak-Out/Alabama by virtue of a name change amendment filed with the Alabama Secretary of State. Therefore, as of Spring, 1994, Right Way owned the majority of SOFI's shares.

Gene Ross and Joe McCord were elected president and vice-president, respectively, at a SOFI stockholders meeting in March of 1994. (Ross, page 78; McCord page 10). However, the parties heavily dispute whether Martin turned over

the day-to-day operation of SOFI to others.[5]

In early 1994, the decision was made to seek outside capital funding to enable SOFI to open "company stores" and expand their operations. (Ross, page 90; McCord, page 28). SOFI entered into an agreement with investment broker Phil Lundquist, as well as the Royce Corporation, in order to gain private venture capital.[6] (McCord, page 13). SOFI consequently retained the law firm of Harkleroad and Hermance in Atlanta, Georgia to prepare a Private Placement Memorandum (hereinafter "PPM"). (McCord, page 57). Harkleroad, the senior partner of the firm

---

[5] Counterclaim Defendants aver that in the Spring of 1994, Martin decided to devote his full energies to his Huntsville, Alabama restaurants and to turn over the day-to-day operations of Steak-Out Franchising to others. (Ross, page 79). However, Counterclaim Plaintiffs contend that Martin never turned over the day-to-day operations, but was instead kept abreast of and involved in significant business and operational issues regarding SOFI throughout 1994. He was routinely copied on significant documents (Letter to Gene Ross dated October 13, 1994; Letter to Gene Ross dated October 28, 1994; Extending Area Development Agreement: Development Scheduled), and Ross, as president, regularly consulted with Martin regarding significant business issues. (Ross, pages 155-57).

Counterclaim Plaintiffs further assert that the termination of Gene Ross and Joe McCord in December 1994 shows that Martin retained the authority to hire and fire even the most senior executives of SOFI. (Martin, pages 107-10). In addition, Martin continued to have signature authority on SOFI's bank accounts and was the only person authorized to borrow money in the company's name. (Fratesi, pages 83-88). During this time, Martin participated in meetings on behalf of SOFI and controlled the private placement process. (Agreement in Principle; Letter to Gene Ross dated March 8, 1994; Letter to Ross, McCord, and Manning from Martin dated March 15, 1994). Finally, they contend that Right Way owned a controlling interest in SOFI in late 1994, and Martin remained the sole director and chairman of the board of SOFI throughout that time. (Martin, pages 110, 185-86).

[6] Counterclaim Plaintiffs contend that the purpose of this outside funding was primarily to buy back Right Way's stock for the benefit of Right Way and Martin. (Private Placement Memorandum, page 9).

at that time, holds himself out to the public as a specialist in corporate acquisitions. (*See* Hackleroad, page 14).

During Spring and Summer of 1994, information was prepared and submitted for use in the PPM.  The parties heavily dispute the extent of Martin's involvement in this effort, as well as the process by which the information was requested by Mr. Hermance and provided by SOFI.[7]  (Ross, pages 155-56).  However, it is undisputed that SOFI brought Joe McCord into the company for the purpose of raising the additional capital funds.  (Ross, page 80).  It is further undisputed that McCord was the primary liaison between SOFI and Phil Lundquist and was the primary contact with Mr. Hermance.  (McCord, pages 14, 42, 48, 57).

In December 1994, the decision was made to refrain from pursuing the private placement offering.  (McCord, page 67; Martin, page 109).  Martin, as chairman of the board of SOFI, made the decision to terminate both McCord and Ross and to downsize SOFI.  (Martin, pages 107-08; McCord, page 69).  After Ross' termination, B.J. Fratesi, the former chief financial officer, was elevated to the position of president.  (Fratesi, page 34).

---

[7] Right Way and Martin contend that the information provided in the PPM was that which Mr. Hermance requested.  (Ross, page 255).  However, Oldfield and Harkleroad contend that the staff of SOFI, likely including David Martin, held a meeting with John Manning wherein they divided responsibility for getting information to Mr. Hermance.  (Hasty, pages 88-100).  This process included the "marking up" and substantive revision of drafts sent by Mr. Hermance to SOFI employees.  (Hasty, pages 97-100).

The firm of Harkleroad and Hermance billed SOFI approximately $100,000.00 for its services in preparing the PPM. (Martin, page 346). Martin contends that Harkleroad expressed an interest in buying the controlling interest in SOFI from Right Way during discussions related to the firm's charges. (*Id.*, pages 345-46). However, Harkleroad contends that Martin simply appeared on his doorstep attempting to sell him the controlling interest in the corporation. (Harkleroad, pages 31, 37-38). Harkleroad denies any prior acquaintance with Martin or any knowledge of SOFI or its operations. (Harkleroad, page 31).

On January 10, 1995, SOFI's shareholders approved the resignation of Martin as director. (Defendant's Exhibit 27). They also approved the appointment of Harkleroad as SOFI's new director and the proposed issuance to Harkleroad of 15% of the issued and outstanding shares of the corporation as part of his compensation package for his new position. *Id*.

On January 11, 1995, SOFI, Right Way, Martin, and Oldfield entered into an agreement stipulating that Right Way would sell 900 shares of SOFI stock to Oldfield for the total sum of $900,000.00. (Defendant's Exhibit 25). Pursuant to the January 11, 1995 Agreement, William D. Hasty was appointed as Escrow Agent to retain physical custody of: (1) the SOFI stock; (2) Martin's and Hackleroad's undated resignations as directors of SOFI; and (3) a letter from Hackleroad and Hermance

relating to the legal fees.  (Defendant's Exhibit 28).

On March 17, 1995, a series of documents was executed in Huntsville, Alabama.  The documents included a promissory note in the amount of $550,000.00 from Oldfield to Right Way, payable in 18 months with a 9% per annum interest rate. (Defendant's Exhibit 29).   On the same date, Harkleroad executed a guaranty agreement and an amended and restated addendum; furthermore, subsequent to the execution of the documents, the escrow agent transferred the stock pursuant to the escrow agreement.  (Defendant's Exhibit 35).  It is in dispute whether the promissory note and the guaranty, two of the documents executed on that date, were part of the contract which included the January 11, 2995 Agreement.

Harkleroad states that he relied on the PPM and alleged misrepresentations made to him by Martin in deciding to purchase stock from SOFI.  Further, he claims that Martin and Right Way suppressed certain material matters in connection with the sale of the stocks.  Although the date is in dispute, at some point Gene Ross met with Harkleroad in his office "to talk with him about the state of Steak-Out.  And to decide whether or not to buy it or not.  Because David had offered to sell, for sale."  (Ross, page 137).  In that meeting, Harkleroad asked him "what I should know about this company before I buy it."  (Ross, pages 138, 139).  Whether or not Ross and McCord discussed with Harkleroad the strengths and weaknesses of the Steak-Out system, the

franchisees, and individual employees is still a matter in dispute.

McCord testified to reviewing documents for Harkleroad prior to March 17, 199, providing him with information, including financial analysis and general comments regarding SOFI; he also testifies to having advised Harkleroad that a franchisee association had been formed prior to that time.[8] (Plaintiff's Exhibits 26, 27, 28; McCord, pages 80-91). As director of operations, McCord was knowledgeable about the financial condition of franchisees and of SOFI as of the time he left the corporation in late December of 1994. (McCord, pages 93, 94, 95). McCord was also aware of the franchisees who were not in compliance with the franchise agreements, as well as those that were failing.[9] (McCord, page 94).

Prior to March 17, 1995, Harkleroad also had discussions with Judy Patuci, SOFI's Marketing Director.[10] (Ross, pages 145, 146). In addition, Ross and McCord

---

[8] Oldfield and Harkleroad contend that these allegations are irrelevant because McCord testified that he did not meet with Harkleroad regarding purchase of SOFI prior to January 11, 1995, and, thereafter, Defendants were already bound by the January 11, 1995 Agreement. (McCord, pages 69-71). In addition, they contend the allegations are irrelevant because Harkleroad was not informed of the franchise association prior to the January 11, 1995 Agreement. (*Id.*).

[9] Oldfield and Harkleroad contend that this is irrelevant because Ross did not communicate his knowledge to Harkleroad prior to the January 11, 1995 Agreement. (January 11, 1995 Agreement; Declaration of Donald R. Harkleroad).

[10] Oldfield and Harkleroad contend that this is irrelevant because Defendants were already bound by the January 11, 1995 Agreement at the time of these discussions. (January 11, 1995 Agreement).

developed a one hundred day business plan for SOFI during the period prior to March 17, 1995.  (Ross, page 145; Evidentiary Submission at tab "A").  However, that plan was not followed by Harkleroad.[11]

### History of the Franchise Agreements

Currently, Right Way owns and operates five Steak-Out  restaurants in Madison County, Alabama.  (Martin, pages 27-28).  The store number for restaurants are 1001, 1002, 1003, 1010, and 1019.  *Id.*  In the past, stores 1001, 1002, 1003, and 1010 operated under franchise agreements entered into with SOFI.  (Martin, pages 27-28; Counterclaim Plaintiff's First Submitted Counterclaim, ¶ 45-49). Although the UFAs have expired for the stores which operated under franchise agreements, Right Way continues to operate those restaurants under the Steak-Out Marks in substantially the same manner as they operated prior to the expiration of the UFAs; stores are operated in the same location, using the same trademarks, logos, menu items, and uniforms.  (Martin, pages 96-97, 452-54, 491-93).

Right Way continues to purchase from suppliers designated by SOFI for the Steak-Out System.  (Martin, pages 92-93).  Right Way also continues to pay the same 2% promotion and development fees required under the UFAs and  provide the same

---

[11] Oldfield and Harkleroad contend that this is irrelevant because these discussions and documents came after the January 11, 1995 Agreement.  (January 11, 1995 Agreement).

required financial and sales reporting statements, just as was done prior to the expiration of the UFAs.  (Martin, pages 87-89).  Right Way also continue to allow SOFI to show the stores to prospective Steak-Out franchisees in the same manner as was done prior to the expiration of the UFAs.  (Martin, pages 89-90).

The franchise agreements for stores 1001 (Jordan Lane) and 1002 (Stephanie Drive) were entered into on October 17, 1988 and expired, according to each agreement's terms, on October 17, 1998.  (Defendant's Exhibit 2 at RW00205 and RW00248).  The franchise agreement for store 1003 (Whitesburg Drive) was entered into on July 23, 1990 and expired, according to its terms, on July 23, 2000. (Defendant's Exhibit 4 at RW00285).  Finally, the franchise agreement for store 1010 (Shelton Road) was entered into on June 1, 1992 and expired, according to its terms, on June 1, 2002.  (Defendant's Exhibit 5 at RW00320).

The parties dispute whether store 1019 has ever operated under a franchise agreement with SOFI, and whether Right Way is currently a franchisee of SOFI.[12]  It is also disputed whether Harkleroad represented that he would prepare language for

---

[12] Right Way and Martin contend that Right Way is not presently a franchisee of SOFI. However, Oldfield and Harkleroad aver that, although the temporal terms of the written UFAs for Plaintiffs' stores have expired, Plaintiffs have continued to operate those restaurants (and an unauthorized restaurant opened in 1995) under the Steak-Out Marks and in the same manner as they did before expiration.  (Martin, pages 96-97).  Therefore, they claim that Plaintiffs' continuing operations on the same terms after the lapse of their UFAs has the legal effect of renewing their previous UFAs on those same terms.

Exhibit A–regarding founder's rights–and bring it to the closing on March 17, 1995.

## The History of the Steak-Out Trademark

Pursuant to an assignment, Steak-Out/Alabama acquired rights in 1987 to the Federal Trademark Registration for the marks "Steak-Out" and "The Steak-Out" (registration numbers 854, 875, 999, and 144 respectively, subject to a reservation of use by the original registrant.). (Martin, pages 68-69). The marks were purchased from The Steak Club, Inc. and assigned to Steak-Out, Inc., with the exception of the state of New York and the New England states. (Martin, pages 69-70).

Steak-Out/Alabama licensed use of the Steak-Out marks to SOFI after its formation in 1987. (Martin, pages 121-22). An October 1, 1991 addendum to the License Agreement expressly states, "Licensor [Steak-Out/Alabama and now Right Way] and Licensee [SOFI] agree that Licensor shall retain the exclusive rights to utilize the 'Steak-out' mark in Madison County, Alabama." (Defendant's Exhibit 7). A September 15, 1992 addendum to the License Agreement contains the identical language.[13]

On March 1, 1994, Steak-Out/Alabama (now Right Way) assigned the Steak-Out trademarks to SOFI. (Martin, page 124; Defendant's Exhibit 9). This document

---

[13] Oldfield and Harkleroad contend that this allegation is irrelevant because both of these agreements referenced herein have been superceded by the Assignment Agreement between Right Way and SOFI. (Assignment of Registered Marks and Agreement).

assigning ownership of the mark, except for Madison County, Alabama, was part of the private placement offering.  (Martin, page 126; Ross, pages 90, 91, 92, and 107). Martin consistently maintained that he wanted to retain ownership of the mark in Madison County.  (Martin, page 99). Ross testified that Martin's main concern was keeping the Steak-Out trademark rights in Madison County.  (Ross, pages 93-94). Specifically, Ross testified that "David [Martin] wanted to make sure that nobody else built Steak-Out stores in Madison County, and that he continued to have the rights to the mark." (Ross, page 93).  To achieve this, an Assignment Agreement was drafted which  included the following provision:

> "As additional consideration, Assignee [SOFI] hereby agrees that Assignor [Steak-Out/Alabama, now Right Way], shall retain the exclusive right to utilize the "Steak-out" marks in Madison County, Alabama: and that from and after the date of this Agreement, Assignor shall not be required to pay royalties pursuant to the UFA between Assignor and Assignee for franchises in Madison County, Alabama."

(Defendants' Exhibit 8.)  Addenda to the original agreement, dated November 16, 1994, and March 17, 1995, contain provisions to the same effect.  (Defendants' Exhibits 10, 35).  The March 17, 1995 addendum was executed by  Donald Harkleroad in his capacity as Chief Executive Officer of SOFI. (Defendants' Exhibit 35).  Whether the rights reserved to Right Way in the Assignment Agreement granted an exclusive territorial license or whether they amounted to a reservation of the exclusive rights without any connection to a franchise is a matter that remains to be

in great dispute.

## The Present  Action

Right Way and Martin allege that neither Oldfield nor Harkleroad paid the $550,000 balance due under the terms of the sales agreement.  Harkleroad admits executing that note, and further admits that the $550,000.00 owed under the promissory note has not been paid. (Harkleroad depo., pages 111-12, 163)  However, Oldfield and Harkleroad contend that the promissory note and guaranty are unenforceable and, therefore, they are not liable for the $550,000.00. On May 30, 2002, Right Way filed a civil action seeking payment and interest pursuant to the promissory note.  Right Way then filed a motion for summary judgment seeking relief for breach of contract pertaining to Defendants' failure to pay on the promissory note. Defendants responded by filing a cross motion for summary judgment on all the claims alleged in the Complaint based on the assertion that the promissory note is unenforceable as a matter of law.   Thereafter, Oldfield and Harkleroad filed a Counterclaim against both Right Way and Martin who then filed a motion for summary judgment against Oldfield and Harkleroad seeking summary judgment on all claims set forth in the  First Amended Counterclaim.  Oldfield and Harkleroad responded by filing a cross motion for summary judgment contending that they are entitled to summary judgment on numerous claims set forth in their Counterclaim.

## Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with

positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## ANALYSIS

As a preliminary matter, the Court will address whether Counterclaim Plaintiff Harkleroad has made any claims individually against either Right Way or Martin. After careful consideration, the Court finds that Harkleroad, as an individual, has made no claim for fraud or, for that matter, any other claims against either Counterclaim Defendant. All contractual allegations flowing from the Counterclaim Defendants are owed to persons other than Harkleroad. Furthermore, Harkleroad was not a party to the Agreement at issue. None of the alleged misrepresentations and suppressions of fact were made directly to Harkleroad; and the fact that he is the primary shareholder of Oldfield Eastern Corporation, the purchaser of the stock at issue in this lawsuit, does not cause him to have an independent remedy for such alleged fraud or suppression. *Warwick Development Company, Inc. v. GV Corporation*, 469 So. 2d 1270, 1276 (Alabama 1985); *See also General Motors Corp. v. Bell*, 714 So. 2d 268, 290 (Ala. 1996) ("It is well settled that when the harm or damage for which the plaintiff seeks recovery are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation.") Accordingly, summary judgement in favor of the Counterclaim Defendants is appropriate as to all claims asserted by Harkleroad individually.[14]

## I.      Common Law Fraud (Count I)

### A.      Oldfield, Harkleroad, SOFI, and Steak-out, Inc.

Oldfield, Harkleroad, Steak-out Franchising, Inc.(SOFI),and Steak-out, Inc.,

contend that, based upon alleged misrepresentations and omissions contained in the

Private Placement Memorandum dated October 31, 1994 used to induce them to buy

stock, they are entitled to summary judgment on Count One for common law

misrepresentation.  (Brief of Defendants and Counterclaim Plaintiffs, page 1).

Prior to *Foremost Insurance Company v. Parham*, the elements of a

misrepresentation claim were (1) a misrepresentation of material fact, (2) made

willfully to deceive, recklessly, without knowledge, or mistakenly, (3) which was

justifiably relied on by the plaintiff under the circumstances, and (4) which caused

damage as a proximate consequence.  *Foremost Ins. Co. v. Parham,* 693 So.2d 409,

*422 (Ala.,1997).   In *Foremost*, the court overruled *Hickox v. Stover*, 551 So. 2d 259

(Ala. 1989), which had adopted a "justifiable reliance" standard, and re-adopted the

*reasonable reliance* standard for fraud claims.  (Emphasis added).  In so doing, the

court in *Foremost* stated:

> The "reasonable reliance" standard is, in our view, a more practical
> standard that will allow the fact finder a greater flexibility in

_____

[14]The Court is cognizant of the fact that Harkleroad did not alone set forth claims against
Counterclaim Defendants, however, this finding is intended to clarify the Court's decision that
Harkleroad is not entitled to remedies as an individual.

determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties.

693 So. 2d at page 421.   Suppression or concealment of fact can, in certain circumstances, also constitute fraud.  The elements of a fraudulent suppression claim are: (1) a duty on the part of the defendant to disclose the facts; (2) concealment, suppression,  or non-disclosure of material facts by the defendant;(3) inducement of the plaintiff to act;(4) action by the plaintiff in reliance on suppression; and (5) damages resulting from the reliance.  *Foremost Ins. Co. v. Parham,* 693 So.2d 409, *423 (Ala.,1997)(citing *Wilson v. Brown,* 496 So.2d 756 (Ala.1986)).

Counterclaim Plaintiffs assert that all alleged misrepresentations and suppressions of fact allegedly made to them by Right Way and Martin were  intended to **induce** Oldfield to purchase the shares of stock owned by Right Way.  According to the evidence, Steak-Out Franchising/Alabama was responsible for the drafting of the Private Placement Memorandum (Defendants' Exhibit 22).  Stock  in Steak-Out Franchising/Alabama was in fact transferred from Right Way to Oldfield, and that transaction formed the basis for the alleged fraud claim.  The Court finds that, during that transaction, no misrepresentations were made to Steak-Out Franchising/Alabama, nor was there any reasonable reliance by Steak-Out Franchising/Alabama upon any

such representations or suppressions.[15]  After the transaction was complete, the stock in Steak-Out Franchising/Alabama was merged into a newly formed corporation, Steak-Out Franchising/Georgia, which was the subsidiary of another newly formed corporation, Steak-Out, Inc./Georgia (Harkleroad,  page 18; Plaintiffs' Exhibit 32). As author of the Private Placement Memorandum, it is axiomatic that Steak-Out Franchising/Alabama[16] cannot claim that it was defrauded based on the content of the document that it in fact authored.  As successors to Steak-Out Franchising/Alabama, Steak-Out Franchising/Georgia and Steak-Out, Inc./Georgia, have no greater rights than their predecessor.  Accordingly, the motion for summary judgment as to the counterclaims for fraud, insofar as the Counterclaim Plaintiffs seek summary judgment on behalf of any Counterclaim Plaintiffs other than Oldfield Eastern Corporation is due to be **GRANTED**.

As to claims filed on behalf of Oldfield, the Court finds that there are genuine issues of material fact as to the involvement of the parties in connection with alleged

---

[15] Furthermore, Alabama law is clear that when both parties to such a transaction are intelligent and fully capable of entering into an arm's length transaction with no confidential relations, there is no duty to disclose information that is not requested.  *Bank of Red Bay v. King*, 482 So.2d 274 (Ala 1985); *Bama Budweiser of Montgomery, Inc. v. Anheiser Busch, Inc.*, 611 So.2d 238 (Ala. 1992).

[16] The law firm of Harkleroad and Hermance, PC, actually authored the PPM on behalf of Steak-Out Franchising/Alabama.  It is greatly disputed as to where the information came from and to what extent David Martin was involved in the production of information for the PPM.

misrepresentations and omissions contained in the Private Placement Memorandum. Furthermore, there are issues of material fact in dispute concerning whether or not Harkleroad, as an experienced securities lawyer, had an obligation to do an independent investigation of the statements contained in the PPM.  Therefore, both motions for summary judgment are due to be **DENIED** as to common law fraud.

### B.    Right Way -Statute of Limitations

Counterclaim Defendants assert that the fraud counterclaim brought against them by Counterclaim Plaintiffs is barred by the Statute of Limitations.  The period in which to raise claims for fraud is two years. *Code of Alabama* § 6-8-84.  Right Way contends that Counterclaim Plaintiffs were placed on reasonable notice of the alleged fraudulent conduct by 1998, and therefore had two years from that point in time within which to file their claims.  The Court finds that there are genuine issues of material fact as to whether the Counterclaim Plaintiffs were or should have been aware of the alleged fraudulent conduct.  Therefore, summary judgment as to the common law fraud claims on the basis of the applicable statute of limitations is due to be **DENIED.**[17]

---

[17] Therefore, the counterclaim for fraud as to Right Way's alleged conduct still remains for the jury to determine as genuine issues of material fact remain.  Accordingly, the matter, as raised by Defendants in a separate motion for summary judgment (doc. 59 & 61), of whether the Promissory Note is enforceable due to alleged fraud in the inducement, is a matter of fact reserved for the jury as well.

**II.      Securities Fraud (Count II)**

Oldfield alleges claims against Right Way and Martin under Alabama securities

law, the Securities Act of 1933, and the Securities and Exchange Act of 1934.

**A.      Alabama Securities Act**

**1.      Alabama Law**

Alabama law relies upon federal law for guidance in determining the scope of

the Code of Alabama § 8-6-19.

> [T]here are few Alabama cases construing the Alabama securities laws,
> [therefore,] federal cases should be reviewed to aid in the proper
> interpretation of the corresponding sections of Alabama statutory law
> inasmuch as the sections are virtually identical. *Buffo v. State 415 So.2d*
> 1158, 1162 (Ala.,1982)

*Batton v. Hackney*, 557 So. 2d 807, 824 (Ala. 1989).  Accordingly, because the civil

liability provision of Alabama Code  § 8-6-19 is virtually identical to Section 12(2)

of the Securities Act of 1933, defenses under the Securities Act of 1933, such as the

"Bespeaks Caution Doctrine", are applicable to claims based on Alabama securities

law.

According to the Bespeaks Caution Doctrine, Counterclaim Plaintiffs'claims

under the Alabama Securities Aaw are due to be denied.  The doctrine provides that:

> [W]hen an offering document's forecasts, opinions, or projections are
> accompanied by meaningful cautionary statements, the forward looking
> statements will not form the basis for a securities fraud claim if those
> statements did not affect the "total mix" of information the document

23

provided investors.  In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*Parnes v. Gateway 2000, Inc.*, 22 F. 3rd 539, 548 (8th Cir. 1997).

Based on the evidence, Oldfield and Harkleroad have relied upon the PPM as the basis for their claims of security fraud under Alabama securities law.  However, as discussed above, the PPM is replete with cautionary language.  According to the Bespeaks Caution Doctrine, the existence of such cautionary language in the PPM renders the alleged omission or misrepresentation pertaining to the cautionary language immaterial as a matter of law.  Examples of such cautionary statements made in the PPM are as follows:

a)   "NO REPRESENTATION OF WARRANTY IS MADE AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  THE COMPANY HEREBY EXTENDS TO EACH OFFEREE THE OPPORTUNITY PRIOR TO THE EXECUTION TO END THE AGREEMENT FOR THE PURCHASE OF THE UNITS, TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, OFFICERS AND OTHER REPRESENTATIVES OF THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN TO THE EXTENT THAT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT  OR EXPENSE" (PPM page iii).

b)   "An investment in the Units is highly speculative and involves a high degree of risk." (PPM page 4).

c)      There is an entire section consisting of 2 ½ pages listing various risk
factors.  Among these are the following:  "The company has generated
only limited revenues to date and incurred losses from operations during
five of the last six fiscal years."  (PPM, page 7).

Accordingly, Counterclaim Defendants' Motion for Summary Judgment in
connection with Counterclaim Plaintiffs' claims under Alabama securities law is due
to be **GRANTED.**  Accordingly, Counterclaim Plaintiffs' cross motion for summary
judgment is due to be **DENIED**.

### 2.      Statute of Limitations

The statute of limitations for an action under Alabama Code § 8-6-19 is two
years.  The underlying question in connection with this issue is whether Oldfield
discovered the alleged fraud of which they complained  more than two years prior to
the filing of this action.  The Court concludes that genuine issues of material fact
exist as to whether the fraud was discovered and recognized as fraudulent conduct
prior to two years before the inception of the action.[18]  However, as decided
previously, Martin and Right Way are entitled to summary judgment under the
Bespeaks Caution Doctrine.

Accordingly, Counterclaim Plaintiffs' Motion for Summary Judgment as to the

---

[18] Because this issue exists, the Court will not address the matter of whether Oldfield's
counterclaims were compulsory or not, thereby effecting the applicability of the statute of
limitations.

claims pertaining to the Alabama Securities Act is hereby **DENIED** and Counterclaim Defendants' Motion for Summary Judgment as to such claims is hereby **GRANTED**.

     **B.**     **Federal Securities**

     **1.**     **Securities Act of 1933-Private Transactions**

The First Amended Counterclaim asserts that Martin and Rightway "made specific statements," and "omitted to make required disclosures." (Amended counterclaim ¶ 73). Arguably, the Securities Act of 1933 provides a remedy for such statements and omissions. Section 12(2) of the Act imposes liability on any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact." 15 U.S.C. § 77l(2).

Nevertheless, that section cannot provide a remedy to the Counterclaim Plaintiffs, because "Section 12 of the 1933 Act does not apply to private transactions." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001)(citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995)). "In *Gustafson*, the Supreme Court analyzed the legislative history of the 1933 Act to determine that Congress meant for § 12 to apply only to public offerings." *Id.* In the case presently before the Court, negotiations to sell the SOFI stock commenced only after the private placement memorandum failed. Subsequently, the sale was accomplished through the parties'

private attorney.   Additionally, a private escrow agent was used to facilitate the sale. This was a private transaction of a closely held corporation, and such a transaction is not within the purview of the Securities Act of 1933.   Thus, the Motion for Summary Judgment as to the claims under the Securities Act of 1933 are due to be **GRANTED in** favor of the Counterclaim Defendants.

### 2.   Rule 10b and 10b(5)

As stated previously, in their First Amended Counterclaim, Counterclaim Plaintiffs assert that Counterclaim Defendants made "made specific statements," and "omitted to make required disclosures." (Amended Counterclaim ¶ 73). To prove a claim for securities fraud under Section 10(b) and Rule 10b-5, the complaining party must show: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999).  Unlike the Securities Act of 1933, Rule 10b-5 indisputably applies to private transactions such as those at issue here. *Landreth Timber Co.*, 471 U.S. at 692 (stating that "although §4(2) of the 1933 Act , 15 U.S.C. §77d(2), exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions").   In their attempt to prevail on summary judgment, the Counterclaim Plaintiffs in fact concede that they lack  evidence of the element of

scienter. The Court finds that Counterclaim Plaintiffs have failed to provide the Court with sufficient evidence of each of the elements of the asserted claim under the Securities and Exchange Act of 1934. Accordingly, the Counterclaim Plaintiffs' Motion for Summary Judgment as to this claim is due to be **DENIED**.

### 3.    "Bespeaks Caution Doctrine"

Based on the record, the Court understands that Counteclaim Plaintiffs' claims of fraud are based solely on the PPM. As discussed above, the PPM contained numerous cautionary statements and pages of text setting forth specific warnings of risks. As a result, any applicable claim under the Securities and Exchange Act of 1934, § 10b is foreclosed by the Bespeaks Caution Doctrine. *See also Saltzberg v. T.M. Sterling/Austin Associates, Ltd.,* 45 F. 3rd 399, 400 (11th Cir. 1995)(The context in which a statement is made is important. When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law). The cautionary language used in the PPM in this case was explicit and linked to the projections about which Counterclaim Plaintiffs complain. In light of the cautionary language clearly set forth in the PPM, Oldfield is unable to establish the necessary misrepresentations or omission of material facts. *Saltzberg,* 45 F. 3rd at 400.    Therefore, summary

judgment in favor of Counterclaim Defendants is due to be **GRANTED** as to Counterclaim Plaintiffs' claims under the Securities Act of 1933 and the Securities Exchange Act of 1934.  Accordingly, Counterclaim Plaintiffs' cross motion is due to be **DENIED** as to such claims.

### 4.    Statute of Repose

Furthermore, the Counterclaim Defendants argue that the Counterclaim Plaintiffs' claims under federal securities law are foreclosed by the applicable statute of repose.

Section 13 of the Securities Act of 1933 provides the applicable statute of limitations and statute of repose in this action:

> No action shall be maintained [under §12(2) ] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought ... more than three years after the sale.

15 U.S.C. § 77m.

The three year statute of repose forecloses the Counterclaim Plaintiffs' claims for violations of the Securities Act of 1933.[19]  *Cook v. Deltona Corp*., 753 F.2d 1552,

---

[19]In their brief, Counterclaim Plaintiffs recognized that the same statute of limitations and repose are applicable to claims of securities fraud under the 1934 Act.  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).

1562 n. 4 (11th Cir. 1985). ("The three-year limitation in the 1933 Act, 15 U.S.C. '

77m, has been held to be an absolute bar, notwithstanding allegations of fraudulent

concealment").   The sale of SOFI stock occurred in 1995 and the counterclaim was

not filed until 2003, eight years later.  Accordingly, Counterclaim Defendants contend

that they are entitled to summary judgment.

Counterclaim Plaintiffs argue, however, that, under federal law, a counterclaim

is not barred if it is a counterclaim for *recoupment* arising out of the same transaction.

*Reiter v. Cooper*, 507 U.S. 258, 263-265(1993)(emphasis added).  According to the

*Reiter* Court, the rationale behind this rule is that a contrary result "would allow a

[plaintiff] to recover...with impunity merely by waiting two years before filing suit."

*Reiter*, 507 U.S. at 264.  In the present case, the counterclaims for fraud brought

under the federal securities acts arose out of the same transaction or occurrence as the

promissory note, which is the basis of Counterclaim Defendants'/Plaintiffs'

underlying claim.

Recoupment is "[t]he right of a defendant, in the same action, to cut down the

plaintiff's demand either because the plaintiff has not complied with some cross

obligation of the contract on which he sues or because he has violated some duty

which the law imposes on him in the making or performance of that contract." *In re

Smith*, 737 F.2d 1549, *1553 (11th Cir.,1984)(quoting Ballentine's Law Dictionary

1070 (3d ed. 1969)).  "Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely." *Reiter v. Cooper*, 507 U.S. 258 (1993).  In determining whether a party still has the right to raise a statutory claim, it is critical to distinguish between a "statute of limitations" and the extinguishment of a statutory right. *See Beach v. Ocwen Federal Bank*, 523 U.S. 410 (1998).  Under a statute of limitations, the right continues to exist, and  the statute acts "merely to bar the remedy for its enforcement." *Id.* at 416.  As a result, a defense of recoupment can be asserted, despite a statute of limitations, because the party asserting recoupment is merely asserting a right, but not seeking a "remedy."   A defense of recoupment cannot be asserted, however, if the right has been extinguished.  The Eleventh Circuit has recognized that a "statute of repose destroys the previously existing rights so that, on the expiration of the statutory period, the cause of action no longer exists." *Bradway v. American National Red Cross*, 992 F.2d 298, 301 (11th Cir. 1993)(quoting *Wright v. Robinson*, 426 S.E.2d 870 (Ga. 1993)); *see also In re Pugh,* 158 F.3d 530, 533 (11th Cir. 1998).

Based upon the foregoing, the statute of limitations for the federal securities claims would be subject to a defense of recoupment, because it only bars the

Counterclaim Plaintiffs' remedy.[20]  However, the three-year period of repose operates to extinguish any rights the Counterclaim Plaintiffs may possess.  As a result, they cannot assert recoupment, and summary judgment is appropriate.

Accordingly, it is evident that the statute of repose operates to extinguish Counterclaim Plaintiffs' federal securities claims.   Therefore, Counterclaim Defendants' motion for summary judgment as to the Counterclaim Plaintiffs' claims under the Securities Act of 1933 and the Securities and Exchange Act of 1934 is due to be **GRANTED**.

## III.    Trademark Infringement and Unfair Competition (Counts III, IV, VI)

In their First Amended Counterclaim, Counterclaim Plaintiffs allege that Counterclaim Defendants have, after the expiration of franchise agreements, unlawfully used the Steak-Out Trademarks, or colorable imitations thereof, in

---

[20] Furthermore, recoupment cannot support the Counterclaim Plaintiffs' requests for affirmative relief. Despite their assertions to the contrary, the Counterclaim Plaintiffs have not properly raised their securities fraud claims as a recoupment.  "To qualify as a recoupment, a cause of action must be asserted defensively." *In re Smith*, 737 F.2d 1549, 1554 (11th Cir. 1984). Where the claim "is an action for affirmative relief for statutory violations," it is not asserted defensively. *Id.*

The Counterclaim Plaintiffs contend that they "have been damaged in an amount to be determined at trial by Counterclaim Defendants' securities fraud." (First Amended Complaint ¶ 77.)  Moreover, they contend that they are entitled to punitive damages and attorneys' fees as a result of the alleged actions of Martin and Right Way. (*Id.*)  Based upon those assertions, it is evident that the Counterclaim Plaintiffs are asserting their claims *offensively*, and therefore recoupment does not apply.

connection with the promotion, marketing, and sale of products at their stores and have done so in violation of agreed upon terms of use, in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114, and in violation of the common law of Alabama. Counterclaim Plaintiffs also allege that Counterclaim Defendants' use, as described above, also constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in that the false designation of origin and false descriptions and representations falsely describe and represent their business activities as being associated with, sponsored by, approved by, licensed by, originating or connected with Steak-Out and licensed by the owner of the Steak-Out Trademarks.

After careful consideration, the Court concludes that because Right Way expressly retained the exclusive right to utilize the trademark in Madison County, summary judgment is due to be **GRANTED** in favor of Counterclaim Defendants as to the claims for trademark infringement and unfair competition.

In 1987, pursuant to a partial assignment, Counterclaim Defendant Right Way acquired the rights to the Federal Trademark Registrations for the marks "Steak-Out" and "The Steak-Out", (Registration Numbers 854,875 and 999,144, respectively) (Martin Dep. at 68-69) in all parts of the United States with the exception of certain Northeastern states.  (Martin Dep. at 69-70).  The marks were purchased from Steak Club, Inc., and the marks were thereafter assigned to Right Way's predecessor-in-

interest, Steak-Out, Inc.  This partial assignment was reflected in the materials provided to Oldfield and Harkleroad.  Right Way used the Steak-Out trademarks and established further rights in the marks through such use under the Lanham Act, 15 U.S.C. § 1125(a).

Also in 1987, Martin formed Steak-Out Franchising, Inc. [Alabama] ("SOFI") to operate as a franchiser for Steak-Out restaurants.  Right Way licensed the use of the Steak Out marks to SOFI (Martin Dep. at 121-122).  An October 1, 1991, addendum to the license agreements states, "Licensor [Right Way ] and Licensee [SOFI] agree that Licensor shall retain the exclusive right to utilize the [Steak Out] Marks in Madison County, Alabama." (Martin Dep. at Ex. 7).  A September 15, 1992 addendum to the license agreement contains the identical language.  (Id. at Ex. 8).

On March 1, 1994, Right Way assigned the Steak-Out trademarks to SOFI pursuant to a partial assignment that, like the original partial assignment, reserved to the assignor (Right Way ) the  exclusive right to utilize the trademarks in the defined geographical area of Madison County, Alabama.  (Martin Dep. at 124 and Ex. 9).  Ross, the [former] Chief Operating Officer of SOFI, testified that Martin's main concern was  keeping the Steak-Out trademark rights in Madison County in the event the company was sold.  (Ross Dep. at 93-94).  The March 17, 1995 agreement entitled "Amended and Restated Addendum to Assignment of Registered Marks and

Agreement" ("Partial Assignment") provides:

> As additional consideration, Assignee [SOFI] hereby agrees that Assignor [Right Way ] ***shall retain the exclusive right*** to utilize the Marks in Madison County, Alabama, and that from and after the date of this Agreement, Assignor shall not be required to pay royalties pursuant to any UFA between Assignor and Assignee for franchises in Madison County . . . Alabama.

 (Emphasis added)

Right Way currently owns and operates five Steak-Out restaurants in Madison County, Alabama (Martin Dep. at 27-28). Store 1019 opened in 1995 and has never operated under a franchise agreement with SOFI. (Martin Dep. at 28). It is undisputed that Right Way has never entered into an agreement revoking the partial assignment of the Steak-Out trademarks or otherwise giving up its reserved rights in Madison County, Alabama. Additionally, Counterclaim Plaintiffs were well aware of Right Way's retention of exclusive rights because Harkleroad, personally, as chief executive officer of SOFI, signed the March 17, 1995 agreement which contains the reservation of rights. (Defendants' Exhibit 35). Therefore, Right Way 's Motion for Summary Judgment as to Oldfield's trademark infringement counterclaims are due to be **GRANTED**; and Oldfield's cross motion is due to be **DENIED**.

Contrary to Counterclaim Plaintiffs' claim, Right Way's right to utilize the Steak- Out trademarks did not arise solely from the expired franchise agreement. The reservation of rights is a partial assignment and not a "license" which the

Counterclaim Plaintiffs claim to have the power to unilaterally revoke.  They base their argument on the notion that the word "utilize" is a word of limitation.  However, such a notion fails in the face of the sentences use of the words "retain", "exclusive", and "right".  There is nothing ambiguous about "retained exclusive rights utilized." By attempting to unilaterally terminate Right Way's use of the trademarks in Madison County, Counterclaim Plaintiffs are asserting rights in Madison County that they have never actually possessed.

Furthermore, historically, partial assignments have repeatedly been upheld.  "It is a well-established principle  both of contract law and of trademark law that limitations in an otherwise valid assignment do not invalidate it." *Premier Dental Products Co. v. Darby Dental Supply Co., Inc., et al.*, 794 F. 2d 850, 856 (3rd Cir. 1986) (court held that limitations on the assignee, including geographical limitations, did not invalidate the assignment); *See also Model Rectifier Corp. v. Takachicho Int'l, Inc.*, 220 U.S.P.Q. 508 (C.D. Calif. 1982) (assignment held valid where assignor retained rights; court stated,  "the ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement"); *Jergens Co. v. Woodbury, Inc.*, 273 F. 952 (D. Del. 1921), aff'd 279 F. 1015 (3rd Cir.); cert. denied 260 U.S. 728 (rights reserved in the assignor).  Well-settled and long-standing trademark law allows an assignor of the trademark to retain

certain rights, including the right to use a trademark in a defined region. *See*, *Griggs, Cooper & Co. v. Erie Preserving Co.*, 131 F. 359, 361-362 (W.D.N.Y. 1904) (court held that an assignment was valid where the assignor assigned his rights to a trademark in five states but retained the right to use the trademark in all other states). *See also* 2 J. McCarthy, Trademarks and Unfair Competition, § 18.8 (4th ed. 2003) ("[a]n assignment is valid even though it may reserve certain rights of use of the mark in the assignor").

Finally, Right Way's reservation of rights in Madison County is not conditional. The plain language of the assignment to SOFI clearly illustrates that Right Way retained the *exclusive right* to utilize the Steak Out trademarks in Madison County, Alabama. If the parties intended that Right Way's reservation of rights be contingent on its remaining a franchisee of SOFI, the parties could have included such a condition in the assignment. No such condition is present in the assignment. The Court finds that Right Way 's Motion for Summary Judgment as to Oldfield's counterclaim for trademark infringement is due to be **GRANTED**; accordingly, Oldfield's cross motion pertaining to the same claim is due to be **DENIED**.

## IV. Federal Trademark Dilution (Count V)

Counterclaim Defendants have moved for summary judgment as to Counterclaim Plaintiffs' claim for federal trademark dilution. In their Counterclaim,

Counterclaim Plaintiffs assert a claim of dilution under § 43 of the Lantham Act based on Counterclaim Defendants' use of the Steak-Out trademark in Madison County, Alabama.  The Lantham Act provides in pertinent part:

> " [an] [o]wner of a famous mark shall be entitled...to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and caused dilution of the distinctive quality of the mark."

15 U.S.C. § 1125 (c)(1).

As discussed previously, Right Way has contractually retained exclusive right to utilize the Steak Out trademarks in Madison County, Alabama.  This claim is not founded on the assertion that Right Way used the trademark in any area other than the area encompassed in the express reservation of right.  Accordingly, Oldfield possess no right to use the marks in Madison County and cannot prevail on a claim of trademark dilution based on Right Way's use of the marks in Madison County.  Right Way is therefore entitled to summary judgment on the federal trademark dilution claim.  Right Way's Motion for Summary Judgment as to Oldfield's counterclaim of trademark dilution is due to be **GRANTED**.

## V.     Breach of Contract (Counts VII & IX)

### A.     Post-termination Obligations (Count VII)

In their seventh claim for relief, Counterclaim Plaintiffs contend that, despite

their alleged obligations to do so, Counterclaim Defendants have failed to comply with the post-expiration covenants under the Franchise Agreements. They argue that such failure constitutes a breach of those Agreements.[21]   As stated above, the Counterclaim Defendants have retained rights to the Steak-Out Marks in Madison County.  Therefore, insofar as this claim depends on the allegedly unlawful use by Counterclaim Defendants of the Steak-Out Marks in Madison County, the Counterclaim Defendants' Motion for Summary Judgment on the claim for breach of post-termination covenant of the franchise agreements is due to be **GRANTED**; accordingly, the Counterclaim Plaintiffs' Motion for Summary Judgment as to this claim is due to be **DENIED**.[22]

---

[21] Specifically, Counterclaim Plaintiffs contend that Counterclaim Defendants have failed to take the following steps upon expiration of their Franchise Agreements:

(a)      Return to Steak-Out all property belonging to Steak-Out, including, but not limited to:
    (1)      Operations Manuals;
    (2)      Advertising Materials;
    (3)      Instruction tapes and materials that are a part of Steak-Out trading programs; and
    (4)      All other materials that bear the Steak-Out Trademarks;
(b)      Discontinue the use of the Steak-Out Trademarks, as wells as any designs, logos, colors, color patterns, or business methods used by Steak-Out, and the use of any business name that includes "Steak-Out" in any retail or wholesale business activities;
(c)      Immediately discontinue all use of any permanent promotional displays or signs displaying any of the Steak-Out Trademarks, service marks, designs, logos, colors and color patterns;
(d)      Refrain from any representation in its business that it is or ever was affiliated with Steak-Out;
(e)      Maintain the confidentiality of Steak-Out's information as required by the Confidentiality Clause of the Franchise Agreements; and
(f)      Adhere to post-termination covenants not to compete.

[22] However, insofar as the claim is based on evidence of breach of contract pertaining to the Agreements that is unrelated to the trademark rights reserved by Counterclaim Defendants,

## B.      January 11, 1995 Agreement (Count IX)

Counterclaim Plaintiffs allege that Counterclaim Defendants have failed to comply with covenants and promises under the January 11, 1995 Agreement.  They contend that the  January 11, 1995 Agreement constituted a binding obligation for Right Way to sell the stock it held in SOFI to Oldfield, although the closing was not scheduled to occur until March 17, 1995.  (Tab S).  The Agreement provided that "SOFI will be operated as it is at the date of this Agreement until first payment under paragraph 1."  (Tab S ¶6).  Counterclaim Plaintiffs argue that Counterclaim Defendants caused SOFI's president to pay out to SOFI franchisees on a per store basis approximately $111,000 from SOFI's promotion and development fund.[23]  (Tab TT ¶37; Fratesi dep. at 54-57).  Counterclaim Defendants argue that they satisfied each of their obligations under the Agreement; however, Counterclaim Plaintiffs have in fact failed to fully satisfy their obligation to pay for the stocks that were transferred to them by Counterclaim Defendants.  Counterclaim Defendants further contend that there is no evidence in the record to support a claim that they failed to satisfy any of their obligations set forth in the Agreement.  Based on the record, the Court finds that significant factual issues remain as to whether Counterclaim Defendants breached the

the Counterclaim Defendants' motion for  summary judgment is due to be **DENIED**.

[23] This money had been paid in by franchisees pursuant to their franchise agreements, which required them to pay 2% of their periodic royalties for the benefit of promotion and development activities.

January 11, 1995 Agreement. Therefore, both Motions for Summary Judgment are due to be **DENIED** as to the claim for breach of contract grounded in the January 11, 1995 Agreement.

### C.    Operating Standards

Counterclaim Plaintiffs contend that Counterclaim Defendants are holdover franchisees and that they have breached their contracts  by departing from the operating standards imposed by SOFI in the following respects:

1.    Requirements that the franchisee use employee uniforms approved by the franchisor;

2.    Requirements that the franchisee purchase products only from approved vendors;

3.    Requirement that the franchisee grant the franchisor the right to enter the store and conduct inspections; and

4.    Requirement that the franchisee install, update, or replace any point of sale system specified by the franchisor.

(Counterclaim Plaintiffs' brief, p. 8).

Contrary to Counterclaim Plaintiffs' assertions, Counterclaim Defendants contend that they are not hold-over franchisees and therefore are not obligated to maintain operating standards set forth by SOFI.  They argue that because they

41

retained the exclusive right to use the trademark in Madison County, they are not obligated to enter into new franchise agreements or comply with UFAs. Furthermore, they contend that at the time the franchise agreements expired, so too did the obligation to comply with the operating standards.

The Court finds that there are material issues of fact as to the breach of contract claim based on the Counterclaim Defendants' alleged noncompliance with Steak-Out operating standards. Therefore, both motions for summary judgment on this issue are due to be **DENIED**.

### VI.    Unjust Enrichment (Count VIII)

Counterclaim Defendants have moved for summary judgment as to Counterclaim Plaintiffs' claim for unjust enrichment. Counterclaim Plaintiffs contend that Counterclaim Defendants have used and continue to use Steak-Out's Intellectual Property and the Steak-Out Trademarks or colorable imitations thereof while operating their stores, without payment to Counterclaim Plaintiffs. They contend that Counterclaim Defendants' continued benefit from their use of the Steak-Out Trademarks or colorable imitations thereof while operating the stores without executed franchise agreements constitutes unjust enrichment. However, the Court has already determined that Right Way contractually retained the exclusive right to use

the trademark in Madison County, Alabama.[24]   Therefore, the Court concludes that Right Way was not unjustly enriched because of its continued use of the Steak-Out Marks in Madison County, and its Motion for Summary Judgment is due to be **GRANTED** as to this claim.

## VII.   Specific Enforcement of Novation (Count X)

Counterclaim Defendants have moved for summary judgment as to Counterclaim Plaintiffs' claim for specific enforcement of a novation.  Counterclaim Plaintiffs contend that they entered into an agreement with Counterclaim Defendants that  Counterclaim Defendants would not seek to recover under the Promissory Note and Guaranty from Counterclaim Plaintiffs, in consideration for Harkleroad not pursuing his claims for fraud.

Under Alabama law, in order to establish a novation there must be:

(1) a previous valid obligation; (2) an agreement of all parties thereto to a new contract or obligation; (3) an agreement that it is an extinguishment of the old contract or obligation; and (4) that the new contract or obligation was not a valid one between the parties thereto.

*Boh Brothers Construction Company, Inc. v. Nelson*, 730 So. 2d 132, 134 (Ala. 1999); *Warrior Drilling & Engineering Company, Inc. v. King*, 446 So. 2d 31 (Ala. 1984);  *Malkove v. First National Bank of Mobile*, 326 So. 2d 108 (Ala. 1976)*;  St.*

---

[24] Additionally, in the Assignment of Registered Marks, Right Way was expressly relieved of the requirement to pay royalties pursuant to any UFA that may have existed between assignor and assignee.

*Clair Industries, Inc. v Harmon's Pipe & Fitting Company*, 213 So. 2d 201 (Ala. 1968); *Friday Lumber Company v. Johnston*, 180 So.2d 259 (Ala. 1965).

Alabama courts have held that "a novation is the substitution of one party for another; a novation releases the party bound by the original contract. . . a novation extinguishes the pre-existing obligation." *Golden v. Bank of Tallasee*, 639 So. 2d 1366, 1369 (Ala. 1994). *Pilalas v. Baldwin County Savings & Loan Association*, 549 So. 2d 92 (Ala. 1989); *Smith v. Midsouth Fiberglass, Inc.*, 531 So. 2d 649 (Ala. 1988); *Bledsoe v. Cargill, Incorporated*, 452 So.2d 1334 (Ala. 1984); *Cammorata v. Woodruff*, 445 So.2d 867 (Ala. 1984); *Bledsoe v. Cargill, Incorporated*, 376 So. 2d 735 (Ala. Civ. App. 1979). The new agreement must meet all of the requisites necessary to form a valid contract. *Cammorata v. Woodruff*, 445 So. 2d 867, 872 (Ala. 1984). In order for there to be a novation, there must be an unambiguous and unequivocal manifestation of assent as would be required to create any other contract. *Sisco v. Empire Gas, Inc. of Belle Mina*, 237 So. 2d 463, 469 (Ala. 1970). For there to be a novation, the parties must agree that the new agreement has that effect. *Moquin v. Cochran*, 380 So. 2d 819 (Ala. 1980). The burden of proof is on the party seeking to establish the novation. *Boh Brothers v. Nelson*, 730 So. 2d 132, 134; *Golden v. Bank of Tallasee*, 639 So. 2d 1366, 1369; *Pilalas v. Baldwin County Savings & Loan Association*, 549 So. 2d 92, 95 (Ala. 1989); and *Haygood v. Woods*,

507 So. 2d 525, 527 (Ala. 1987).

Counterclaim Defendants deny that there was ever any new contract entered into; they also contend that there is no evidence to support the allegation that a new contract was executed between the parties.[25]  Although Counterclaim Defendants admit that settlement negotiations took place between the parties over several years, they assert that  at no time did those negotiations ripen into an agreement such as that alleged by Counterclaim Plaintiffs. Counterclaim Plaintiffs contend that the record contains "ample" evidence of conduct by Counterclaim Defendants from which a jury could infer a novation of the Promissory Note.  The Court disagrees.  Based on the record, the Court cannot find evidence to support the finding of a new contract. Without a valid contract to replace the prior agreement, there can be no novation.  In order to have a valid contract, there must be evidence that there was a meeting of the minds between the parties.  *Marvins, Inc. v. Robertson*, 608 So. 2d 391, 393, 394 (Ala. 1992).  It is evident to the Court that there is no evidence of a meeting of the minds between the parties pertaining to a new contract.  Therefore, Counterclaim Defendants' Motion for Summary Judgment is due to be **GRANTED** as to the claim pertaining to the execution of a novation between parties.

---

[25] Counterclaim Plaintiffs concede that there was never any formal written agreement reflecting the alleged novation.

## CONCLUSION

Based on the foregoing, the Court has determined that Counterclaim Defendants' motion for summary judgment is due to be **DENIED, in part**, and **GRANTED, in part**; and Counterclaim Plaintiffs' motions for summary judgment are due to be **DENIED** in full.

A separate **ORDER** will be entered.

**DONE** this 4th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge